**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

CALPINE CORPORATION, et al.,

Debtor.

CALPINE ENERGY SERVICES, L.P.,

Plaintiff,

-against-

RELIANT ENERGY ELECTRIC
SOLUTIONS, L.L.C.,

Defendant.

Chapter 11 Case

Case No. 05-60200 (BRL)

Adversary Proceeding No. 08-1251(BRL)

APPEARANCES:

LOWENSTEIN SANDLER PC
1251 Avenue of the Americas, 18th Floor
New York, NY 10020
Telephone: (212) 262-6700
By:    Michael S. Etkin
       John K. Sherwood
       John R. Middleton Jr.
*Attorneys for Defendant, Reliant Energy*
*Electric Solutions, L.L.C.*

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
By:    Richard M. Cieri
       David R. Seligman (admitted *pro hac vice*)
*Attorneys for Plaintiff, Calpine Energy*
*Services, L.P.*

Before:  Hon. Burton R. Lifland
         United States Bankruptcy Judge

1

**MEMORANDUM DECISION AND ORDER DENYING MOTION OF RELIANT
ENERGY ELECTRIC SOLUTIONS, L.L.C. FOR SUMMARY JUDGMENT**

Before the Court is the motion for summary judgment (the "Motion") filed by Reliant Energy Electric Solutions, L.L.C. ("Reliant"), defendant in the above-captioned adversary proceeding, seeking to dismiss the adversary complaint (the "Complaint") of Calpine Energy Services, L.P. ("Calpine") arising out of a Master Power Purchase and Sale Agreement (the "Master Agreement"). Reliant contends that pursuant to section 5.5 of the Master Agreement, Calpine failed to timely challenge its calculation of damages, and is thereby precluded from bringing any causes of action challenging Reliant's claims. Calpine objects to Reliant's Motion and asserts, *inter alia*, that section 5.5 of the Master Agreement is unenforceable and does not bar any claims asserted by Calpine against Reliant. For the reasons set forth below and at the hearing held on May 6, 2009, the Motion is denied.

## BACKGROUND

**The Master Agreement**

On March 1, 2003, Reliant and Calpine entered into the Master Agreement. The Master Agreement specified the general terms and conditions under which Calpine and Reliant could execute forward transactions for the purchase and sale of various energy products ("Transactions"). Pursuant to the Master Agreement, Reliant and Calpine entered into six Transactions whereby Reliant would receive specified energy products and ancillary services from Calpine in return for specified capacity and energy payments. Both parties acknowledged in the Master Agreement that each was a "forward contract merchant" and that each Transaction was a "forward contract" as defined by section 101 of the Bankruptcy Code (the "Code").

The terms of the Master Agreement currently at issue are set forth in Article 5. Section 5.2 of the Master Agreement allowed either party to terminate all Transactions upon an "Event of

2

Default," defined to include, *inter alia*, the bankruptcy of either party. Reliant and Calpine agreed that upon an Event of Default, the Non-Defaulting party could declare an Early Termination Date, accelerate all amounts due, and liquidate and terminate all executed Transactions. Master Agreement, § 5.2.

Article 5 also established the procedure by which the parties would reconcile and resolve their outstanding rights and obligations under the Transactions in the event of an Early Termination Date. First, section 5.2 of the Master Agreement directed "[t]he Non-Defaulting Party [to] calculate, in a *commercially reasonable manner*, a Settlement Amount[1] for each such Terminated Transaction as of the Early Termination date." Master Agreement, § 5.2 (emphasis added). Next, the Non-Defaulting Party was required to net out the Settlements due to both the Non-Defaulting Party and the Defaulting Party to a single liquidated amount (the "Termination Payment"). Master Agreement, § 5.3. More importantly, section 5.4 of the Master Agreement required the Non-Defaulting Party to disclose the amount of the Termination Payment to the Defaulting Party, and provide "a written statement explaining *in reasonable detail the calculation*" of the Termination Payment. Master Agreement, § 5.4 (emphasis added).

Finally, Article 5 set forth the procedure and timetable for raising any disputes with respect to the Termination Payment. In particular, section 5.5 provided that:

> If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment . . . the Defaulting Party shall, *within two (2) Business Days of receipt of Non-Defaulting Party's calculation of the Termination Payment*, provide the Non-Defaulting Party a detailed written explanation of the basis for such dispute . . . .

Master Agreement, § 5.5 (emphasis added).

---

[1] "Settlement Amount" is defined in section 1.56 of the Master Agreement as "with respect to a Transaction and the Non-Defaulting Party, the Losses or Gains, and Costs . . . which such party incurs as a result of the liquidation of a Terminated Transaction pursuant to Section 5.2." Master Agreement, § 1.56.

3

**Calpine's Bankruptcy Filing And Resulting Event Of Default**

On December 20, 2005, Calpine Corporation and its affiliate debtors filed their voluntary chapter 11 bankruptcy petitions. Shortly thereafter, on December 30, 2005, Reliant provided written notice to Calpine declaring the filings an Event of Default as defined by the Master Agreement, and designated January 4, 2006 as the Early Termination Date of the six prepetition Transactions (the "Terminated Transactions").

Consistent with the Master Agreement, on January 26, 2006, Reliant sent Calpine a letter ("Termination Payment Letter") stating that it had calculated the Settlement Amount for the Terminated Transactions to be $62,270,804.00. The Termination Payment Letter further stated that the Termination Payment due to Reliant from Calpine was $2,041,232.00, which represented the difference between Reliant's calculation of the liquidated value of the Terminated Transactions, and amounts Reliant owed to Calpine ($60,279,572.00) for power and services Capline provided to Reliant as of the Early Termination Date. Most importantly, the letter did not provide any information regarding the methodology used by Reliant in calculating the Termination Payment. Instead, the letter simply listed the alleged value of each Terminated Transaction.

The next day, on January 27, 2006, Calpine sent a letter to Reliant acknowledging receipt of the Termination Payment Letter and expressly reserving its right to dispute the Termination Payment. Thereafter, on July 27, 2006, Reliant filed an unsecured, non-priority, proof of claim in the bankruptcy proceeding.

**Calpine's Dispute Of The Commercial Reasonableness Of Reliant's Termination Payment Calculation And Efforts Between The Parties To Resolve Their Dispute.**

Shortly after Calpine received the Termination Payment Letter, the parties began to engage in informal discussions aimed at resolving their dispute with respect to the Termination

4

Payment amount. *See* Pl.'s Mem. of Law in Opp'n ("Opposition"), Ex. 10. Ultimately, in June 2007, at Reliant's request, Reliant and Calpine entered into a Non-Disclosure Agreement (the "NDA") to govern the exchange of the parties' respective proprietary information concerning the methodology used to calculate the Termination Payment. The NDA's stated purpose was to facilitate "discussions regarding the methodology used to calculate the Termination Payment" and "negotiate a potential settlement" of Reliant's claims. NDA, § 1.

Consistent with the NDA, on September 29, 2007, Reliant sent Calpine an email with attachments containing files supporting Reliant's calculation of the Termination Payment. The email specifically stated that the information was "being provided with a view toward resolution" of the parties' dispute, and invited Calpine to respond with its own Termination Payment calculation. Opposition, Ex. 13. In response, Calpine provided Reliant with its own calculation of the Termination Payment, along with supporting documentation, which purported to establish that Reliant in fact owed Calpine over $10 million. Opposition, Ex. 14–15. Upon receipt, Reliant informed Calpine that its structuring group was analyzing Calpine's calculation. Opposition, Ex. 16.

**The Adversary Complaint And Reliant's Summary Judgment Motion**

Unable to resolve its dispute with Reliant, Calpine filed its Complaint in June 2008. The Complaint disputes Reliant's calculation of the Termination Payment and objects to Reliant's proof of claim. Calpine alleges that Reliant breached the Master Agreement by failing to calculate the Termination Payment in a "commercially reasonable manner" and asserts that Calpine is due at least $10,570,532.00 from Reliant. In response, Reliant argues in its motion for summary judgment that Calpine's claims are barred because it failed to dispute the Termination

5

Payment calculation within two business days of receipt pursuant to section 5.5 of the Master Agreement.

## DISCUSSION

### I. Rule 56 of the Federal Rules of Civil Procedure

Rule 56 of the Federal Rules of Civil Procedure, made applicable herein by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs the filing of motions for summary judgment and states, in relevant part, that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Morenz v. Wilson-Coker,* 415 F.3d 230, 234 (2d Cir. 2005).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Celotex Corp.*, 477 U.S. at 323; *see also In re Northwest Airlines Corp.*, 383 B.R. 283, 291 (Bankr. S.D.N.Y. 2008); *Ames Dep't Stores, Inc.,* 161 B.R. 87, 89 (Bankr. S.D.N.Y. 1993). A fact is considered material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Once the moving party has established its initial burden, the nonmoving party must come forward with competent summary judgment evidence of the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *In re WorldCom, Inc.*, 377 B.R. 77, 85 (Bankr. S.D.N.Y. 2007).

**II. Genuine Issues Of Material Fact Exist As To Whether Reliant Waived Its Right To Assert Section 5.5 Of The Master Agreement As A Defense.**

Under New York contract law, "any party to a contract may [impliedly] waive a provision of that contract." *In re Caldor, Inc.-NY*, 204 B.R. 855, 861 (Bankr. S.D.N.Y. 1997); *see also* 13 WILLISTON ON CONTRACTS § 39:30 (4th ed. rev. 1999). An implied waiver is established "by a party's conduct which is inconsistent with the assertion of the right to performance allegedly waived, or by conduct which indicates that strict compliance with the contract will not be required . . . ." 13 WILLISTON ON CONTRACTS § 39:30 (4th ed. rev. 1999). Moreover, whether an implied waiver has occurred is generally a question of fact for the fact finder. 13 WILLISTON ON CONTRACTS § 39:21 (4th ed. rev. 1999) ("A waiver, not express, found in the acts, conduct, or language of a party, is rarely established as a matter of law rather than as a matter of fact . . . .") (quoting *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 11, 37, 118 N.E. 210 (1917)).

Genuine issues of material fact exist as to whether Reliant impliedly waived its right to assert section 5.5 of the Master Agreement as a defense to Calpine's Complaint. Prior to the filing of the Complaint, Reliant engaged in various activities that raise the possibility of implied waiver. First, following Calpine's receipt of the Termination Payment Letter, Calpine and Reliant engaged in informal discussions aimed at settling their dispute with respect to Termination Payment calculation. Second, in June 2007, at Reliant's request, the parties entered into the NDA, which specifically stated that its primary purpose was to negotiate a potential settlement of Reliant's claims. Third, after the NDA was executed, Reliant provided Calpine information regarding its Termination Payment calculation and stated that it was "being provided with a view toward resolution" of the parties' dispute. Last, the record indicates that prior to its answer to the Complaint, Reliant never raised section 5.5 of the Master Agreement as a defense.

7

Based upon Reliant's actions, and written agreements and communications with Calpine, a reasonable jury could find that Reliant impliedly waived its right to assert the time limitation in section 5.5 of the Master Agreement as a defense. Indeed, elements of waiver can be found throughout the parties' post-default course of conduct. As such, it is difficult to understand why over three years after default, Reliant now for the first time, bottoms its motion for summary judgment solely on a strict reading of section 5.5 of the Master Agreement.

Accordingly, I find that summary judgment is inappropriate at this time. *See Liberty Lobby*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").[2]

### III. Genuine Issues of Material Fact Exist As To Whether Reliant Frustrated Calpine's Ability To Comply With Section 5.5 Of The Master Agreement.

The "doctrine of prevention" provides that "a party to a contract cannot rely on the failure of another to perform when he has frustrated or prevented performance." *Hidden Meadows Dev. Co. v. Parmelee's Forest Prods., Inc.*, 289 A.D.2d 642, 644, 734 N.Y.S.2d 269 (N.Y. App. Div. 2001) (citations omitted); *see also* 13 WILLISTON ON CONTRACTS § 39:3 (4th ed. rev. 1999) ("a contracting party whose performance of his or her promise is prevented by the other party is not obligated to perform . . . ."). It follows that the party who prevents performance is "not allowed to recover damages for the resulting nonperformance or otherwise benefit from his or her wrongful acts." 13 WILLISTON ON CONTRACTS § 39:3 (4th ed. rev. 1999).

---

[2] Reliant argues that it did not waive its rights under section 5.5 of the Master Agreement because it agreed to participate in settlement discussions solely for the purpose of resolving its pending claim in the bankruptcy proceeding, and that it reserved all rights and related defenses. This argument is without merit because Reliant's bankruptcy claim is based on its calculation of the Termination Payment, which is at issue in the adversary proceeding. Accordingly, Reliant cannot plausibly distinguish negotiations to resolve its pending bankruptcy claim from the claims raised in Calpine's Complaint.

8

A genuine issue of material facts exists as to whether Reliant frustrated Calpine's ability to comply with section 5.5 of the Master Agreement.  As alleged, Reliant's Termination Payment Letter failed to comply with section 5.4 of the Master Agreement because it did not contain "a written statement explaining *in reasonable detail* the calculation" of the Termination Payment.  Master Agreement, § 5.4 (emphasis added).  Calpine therefore asserts that Reliant prevented it from complying with section 5.5 of the Master Agreement because without a description of the calculation, it was impossible to "provide [Reliant] a detailed written explanation of the basis for [its] dispute."  Master Agreement, § 5.5.  In response, Reliant argues that it did not frustrate Calpine's ability to comply with section 5.5 of the Master Agreement because the lack of information did not prevent Calpine from simply calculating its own rebuttal Termination Payment.  In light of the arguments presented, it appears that the application of the prevention doctrine hinges on the proper interpretation of section 5.5 of the Master Agreement.

Calpine's obligations under section 5.5 of the Master Agreement can be interpreted in two different ways.  On the one hand, section 5.5 can be read simply to require Calpine to rebut Reliant's Termination Payment calculation with its own Termination Payment within two business days of receipt.  Under this reading, Reliant did not frustrate Calpine's ability to comply with section 5.5 of the Master Agreement because the information provided (even if unhelpful) would not prevent Calpine from furnishing an alternate Termination Payment calculation on its own.  On the other hand, section 5.5 can be read to require Calpine to dispute Reliant's calculation by dissecting and critiquing the methodology used by Reliant in calculating the Termination Payment.  Under this second and more logical reading, Reliant did in fact frustrate Calpine's ability to comply with section 5.5 of the Master Agreement because Calpine lacked information regarding the methodology Reliant employed in calculating the Termination

9

Payment (a transparent baseline). In sum, summary judgment is inappropriate because the obligation under section 5.5 is a material fact which dictates whether the prevention doctrine applies, and there exists a genuine issue as to the proper interpretation of section 5.5.

**IV. Notwithstanding The Discussion Above, Calpine's Position That It Was Not Obligated To Perform Under Section 5.5 Of The Master Agreement Because It Was A Postpetition Obligation Under An Executory Contract Has Substantial Merit.**

Section 365(a) of the Code allows a debtor to assume or reject executory contracts. In a chapter 11 case, the deadline to assume or reject an executory contract is anytime prior to plan confirmation. 11 U.S.C. § 365(d)(2). During this gap period between the petition date and plan confirmation, a creditor may not enforce a prepetition executory contract against the debtor. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984); *U.S. Postal Serv. v. Dewey Freight Sys. Inc.*, 31 F.3d 620, 624 (8th Cir. 1994) ("before executory contracts are assumed or rejected under § 365(a), those contracts remain in existence, *enforceable by the debtor but not against the debtor*.") (emphasis in original)); *In re McLean Indus., Inc.*, 96 B.R. 440, 448 (Bankr. S.D.N.Y. 1989). Moreover, the debtor is relieved of any postpetition obligation under an executory contract during the gap period. *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 n.4 (Bankr. S.D.N.Y. 1998) ("Generally, the debtor in possession is not required to perform [postpetition obligations under an executory contract] prior to assumption.") (internal citations omitted)); *In re El Paso Refinery, L.P.*, 196 B.R. 58, 72 (Bankr. W.D. Tex. 1996). Consequently, a creditor may not rely on a debtor's failure to perform a postpetition obligation under an executory contract as a defense to a debtor's breach of contract claim. *See, e.g., El Paso Refinery*, 196 B.R. at 72.

In this case, the parties do not dispute the fact that the Master Agreement was an executory contract subject to assumption or rejection by Calpine.[3] Calpine posits that its

---

[3] It is important to note that section 5.2 of the Master Agreement, by its terms, only terminated the Transactions; it did not terminate the Master Agreement.

10

obligation to provide a detailed written explanation of its basis for disputing Reliant's Termination Payment calculation within two days of receipt was a postpetition obligation, and that, because the Master Agreement was an executory contract and Calpine's responsibilities under section 5.5 of the Master Agreement were postpetition obligations, Calpine appropriately preserved its rights to dispute the Termination Payment within two business days. Therefore, Reliant's reliance on Calpine's failure to comply with section 5.5 of the Master Agreement as a defense to Calpine's breach of contract claim is misplaced.

Reliant rebuts this assertion by contending that section 556 of the Code somehow rendered section 5.5 of the Master Agreement enforceable against Calpine. Section 556 of the Code, in relevant part, states that "[t]he contractual right of a . . . forward contract merchant to cause liquidation, termination, or acceleration of a . . . forward contract because of a condition of the kind specified in section 365(e)(1)"[4] is enforceable against the debtor postpetition. 11 U.S.C. § 556. Thus, section 556 of the Code allows a creditor to exercise a prepetition contractual right to terminate a forward contract based upon the debtor's filing of a bankruptcy petition. However, by its terms, section 556 of the Code is limited to enforcing only those terms that trigger termination upon the occurrence of one of the three specified conditions listed in section 365(e)(1) of the Code. 6 COLLIER ON BANKRUPTCY ¶ 556.04[3] at 556-13 (15th ed. rev. 1997) (asserting section 556 "protects only rights triggered by 'a condition of the kind specified in section 365(e)(1)'"). Accordingly, contractual rights that are merely ancillary or incidental to an ipso facto clause are not enforceable under section 556 of the Code.

---

[4] Section 365(e) renders unenforceable contractual rights to terminate an executory contract based upon "(A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement." These clauses are commonly known as "ipso facto clauses."

11

Consistent with section 556 of the Code and section 5.2 of the Master Agreement, Reliant terminated the six prepetition Transactions following Calpine's bankruptcy filing. Reliant, however, attempts to take section 556 of the Code a step further. Reliant asserts that section 5.5 of the Master Agreement, although not an ipso facto clause, is enforceable under section 556 of the Code because it "goes to the very heart of the termination process." Def.'s Reply Mem. of Law in Supp., 5. In other words, Reliant argues that in addition to rendering ipso facto clauses in forward contracts enforceable, section 556 of the Code also allows a creditor to enforce clauses that are incidental or ancillary to an ipso facto clause. Unfortunately, the plain language of section 556 of the Code does not lend itself to such an expansive reading, nor does this Court believe such a reading would be appropriate. Section 556 of Code, by its terms, clearly limits its reach to only those clauses that trigger termination upon the occurrence of a condition specified in section 365(e)(1) of the Code. Accordingly, section 5.5 of the Master Agreement is not enforceable against Calpine because it was a postpetition obligation under an executory contract and was not a contractual right to terminate a forward contract based upon a condition of the kind specified in section 365(e)(1) of the Code.

## **CONCLUSION**

For the reasons set forth above and at oral argument, the Motion is hereby denied.

IT IS SO ORDERED.

Dated: May 7, 2009
       New York, New York

                                                    /s/ Burton R. Lifland
                                                    The Honorable Burton R. Lifland
                                                    United States Bankruptcy Judge

12